The STATE of Texas, Appellant,

v.

George Roy SMITH, Appellee.

No. 14–01–00931–CR.

Court of Appeals of Texas, Houston (14th Dist.).

March 14, 2002.

Discretionary Review Refused Aug. 21, 2002.

Kyle A. Davis, Bryan, for appellants.

Peter Holger Keim, Bryan, for appellees.

Panel consists of Chief Justice BRISTER and Justices ANDERSON and FROST.

## MAJORITY OPINION

JOHN S. ANDERSON, Justice.

Appellee was indicted for the offense of burglary and attempted aggravated assault. The trial court granted appellee's motion to dismiss the indictment based upon speedy trial grounds. In this accelerated appeal, the State brings a single point of error challenging the trial court's dismissal. We reverse and remand.

A rendition of the underlying facts of the actual offense are unnecessary to the disposition of the appeal. Accordingly, we will recite only those procedural facts that impact our decision.

## PROCEDURAL HISTORY

On July 8, 1998, a grand jury indicted appellee for the offenses of burglary and attempted aggravated assault, which were alleged to have occurred on or about January 6, 1996. Appellee was arrested later that year and posted a cash bond through his employer, John Mathis. On February 14, 2001, the trial court mailed a notice of setting to appellee at 1344 Banks, Dallas TX 75223; apparently, the address stated on the bond. The notice stated that a hearing to determine attorney status was set for March 21, 2001, and the failure to appear could result in bond forfeiture and arrest. This action was prompted when appellee's employer, who had posted the bond, contacted the State to determine the status of the case. Appellee did not appear for the hearing and a capias was issued for his arrest. Appellee later admitted he no longer resided at the address stated on the bond and had moved twice since the bond was posted. He also claimed, however, that both he and his employer notified the trial court of his changes of address.

Appellee was not arrested as a result of the capias. On June 29, 2001, for reasons left unexplained by the State, an assistant district attorney requested that appellee's bond be reinstated. The trial court issued an order on June 29, 2001, reinstating appellee's bond for the $5000.00 that had been previously posted. The order to reinstate bond contained appellee's current address. There is no indication of how the State came to learn of the new address. Then, on July 5, 2001, having learned of appellee's current address, a second notice of setting was sent to appellee at his current address, 7148 Shallowater, Maybank, TX 75147. This second notice also stated that a hearing to determine attorney status was set for July 20, 2001, and the failure to appear could result in bond forfeiture and arrest.

On July 20, 2001, appellee appeared for the hearing and an attorney was appointed to represent him. On July 23, 2001, the trial court sent a third notice to appellee stating that the case had been set for (1) final pretrial hearing on September 7, 2001, (2) jury selection on September 10, 2001, and (3) jury trial on September 11, 2001.

The "final pretrial" hearing was held on September 7, 2001, as scheduled. Appellee and his attorney appeared at the hearing. The State announced it was "not ready to go to trial" because, though it had served the complainant in the attempted aggravated assault charge with a subpoena, it had not spoken with him. Moreover, the owner of the home appellee was alleged to have burglarized had provided information to the State that suggested there had been no burglary. The assistant district attorney stated, "I think that ultimately and shortly this matter will be resolved. I just need to talk to the victim."

In response, the trial court stated the matter would go to trial as scheduled. After this statement, appellee's counsel stated he would not object to a continuance. The trial court stated, however, it did object to any continuance given the age of the case. The trial court told the parties the case would go to trial as scheduled or would be dismissed. Specifically, the court stated, "This man has been under indictment and under accusation long enough. You are No. 1 for trial on Monday morning."

On Monday, September 10, 2001, the parties appeared for trial. The trial court noted appellee had filed a motion to dismiss the indictment on the grounds that he had been denied his right to a speedy trial under both the state and federal constitutions. In response to the motion to dismiss, the court held an impromptu hearing at which appellee testified. After the hearing, the trial court granted the motion to dismiss. The State perfected this appeal.

### SPEEDY TRIAL ANALYSIS

■ An accused is guaranteed the right to a speedy trial under the Sixth Amendment of the United States Constitution, Article 1, Section 10 of the Texas Constitution, and article 1.05 of the Texas Code of Criminal Procedure. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.05 (Vernon 1977). The essential ingredient of the speedy trial guarantee is "orderly expedition and not mere speed." *State v. Munoz*, 991 S.W.2d 818, 821 (Tex.Crim.App. 1999) (quoting *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 459–60, 30 L.Ed.2d 468 (1971)). Since 1972, the Supreme Court has required courts to analyze federal constitutional speedy trial claims by weighing and then balancing four factors: (1) length of the delay; (2) reason for the delay; (3) assertion of the right; and (4) prejudice to the accused. *Id.* (citing *Barker v. Wingo*, 407 U.S. 514, 530–32, 92 S.Ct. 2182, 2192–93, 33 L.Ed.2d 101 (1972)). This balancing test requires weighing case-by-case the conduct of both the prosecution and the accused. *Id.* No single *Barker* factor is necessary or sufficient to the finding of a speedy trial violation. *Id.*; *Webb v. State*, 36 S.W.3d 164, 172 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd). The factors must be considered together with other relevant circumstances. *Id.* In determining whether an accused was denied his state right to a speedy trial, we use the same balancing test used to evaluate his federal right to a speedy trial. *Webb*, 36 S.W.3d at 172.

■ In reviewing a trial court's decision on a speedy trial claim, the appellate court should apply a "bifurcated standard of review," meaning "an abuse of discretion standard for the factual components" and a *"de novo"* standard for the legal components of the trial court's decision. *Munoz*, 991 S.W.2d at 821; *Webb*, 36 S.W.3d at 172. Because appellee prevailed in the trial court, we must presume the trial court resolved any disputed fact issues in his favor and we are required to

defer to the implied findings of fact that the record supports. *See Munoz*, 991 S.W.2d at 821; *Guzman*, 955 S.W.2d at 89.

## LENGTH OF DELAY

■ We first consider the length of the delay between the accused's arrest and trial. The length of delay is a "triggering mechanism" for analysis of the other *Barker* factors. *Munoz*, 991 S.W.2d at 821 (quoting *Barker*, 407 U.S. at 530–32, 92 S.Ct. at 2192–93). Until there is some delay that is "presumptively prejudicial," there is no necessity for inquiry into the other *Barker* factors. *Id.; Webb*, 36 S.W.3d at 172. There is no per se length of delay that automatically constitutes a violation of the right to a speedy trial. *Webb*, 36 S.W.3d at 172 (citing *Hull v. State*, 699 S.W.2d at 220, 221 (Tex.Crim. App.1985) (en banc)). The delay is measured from the time the defendant is formally accused or arrested until the time of trial. *Webb*, 36 S.W.3d at 173 (citing *Marion*, 404 U.S. at 313, 92 S.Ct. at 459). Most delays of eight months or more are considered presumptively unreasonable and prejudicial. *Id.* The Texas Court of Criminal Appeals considered a seventeen-month delay presumptively unreasonable. *Munoz*, 991 S.W.2d at 822.

■ In this case, appellee was indicted on July 8, 1998, but trial did not begin until September 10, 2001—a delay of more than three years. We hold that a delay of more than three years is presumptively unreasonable and more than sufficient to trigger consideration of the other *Barker* factors. Moreover, the State appears to concede this fact because in its brief it recognizes that delays of eight months or more have been considered presumptively unreasonable and prejudicial. Additionally, the State makes no argument that the delay in this case was not presumptively unreasonable and prejudicial. Because we conclude the delay is presumptively prejudicial, we now address each of the remaining *Barker* factors.

## REASON FOR THE DELAY

■ The State has the burden to prove a reason for the delay. *Webb*, 36 S.W.3d at 173. Under *Barker*, "different weights should be assigned to different reasons" for the delay. *Munoz*, 991 S.W.2d at 822 (quoting *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192). A deliberate attempt to delay the trial should be weighed heavily against the State. *Id.* A more neutral reason such as negligence or overcrowded courts should be weighed less heavily against the State. *Id.* A valid reason for the delay should not be weighed against the State at all. *Id.* If the delay is attributable in whole or in part to the defendant, it may constitute a waiver of his speedy trial claim. *Munoz*, 991 S.W.2d at 822 (citing *Barker*, 407 U.S. at 528–30, 92 S.Ct. at 2191–92).

■ During the hearing on appellee's motion to dismiss the indictment based on speedy trial grounds and in its appellate brief, the State attributes the delay to appellee. The State argues appellee is wholly responsible for the delay in bringing the case to trial because of his frequent address changes and his failure to apprize the court of his correct address. The State contends that because appellee did not keep the trial court informed of his current address, the court could not notify appellee of any settings. Thus, the State concludes, appellee has waived his right to a speedy trial.

At the hearing, appellee admitted that after his bond was posted listing the Dallas address, he moved twice. He ultimately moved to the Maybank address, where he has resided for the past two years and where he received the notice sent by the trial court in July 2001. He also testified,

however, that both he and Mathis, the employer who posted his bond, contacted the trial court about his address change. Appellee stated Mathis e-mailed and faxed the address change because he did not want to lose the $5,000.00 cash bond he had posted. Appellee testified that until he received the notice for the July 20, 2001, hearing, he had never received notice of any setting or a trial date. Moreover, according to appellee, Mathis continually called, trying to get the trial underway. Appellee also claimed to have called on his own behalf approximately three times, but was told there were no "documents" on him. Appellee specifically denied having done anything to delay his trial.

There is a notation on the trial court's docket sheet, dated July 17, 1998, which reflects the court had no address for appellee in the computer and "no bond." However, we know there was a bond and that bond reflected appellee's Dallas address.

█ Based on the record before us, we find there is no evidence of a deliberate attempt by the State to delay the trial. However, appellee testified both he and Mathis contacted the trial court to advise the court of appellee's address change. The State made some attempt to challenge appellee's testimony, but did not refute it. The trial court apparently found this testimony credible because at the end of the hearing the court stated it could see no reason or justification for the delay. Resolving this disputed fact issue in appellee's favor, we find no error by the trial court in implicitly determining the State had no valid reason for the delay and the delay was not attributable to appellee. *See Munoz,* 991 S.W.2d at 821; *Guzman,* 955 S.W.2d at 89. A defendant has no duty to bring himself to trial, and the primary burden rests upon the courts and the prosecution to insure that cases are

brought to trial. *Barker,* 407 U.S. at 527, 92 S.Ct. at 2190. Accordingly, based on the evidence presented, the trial court's actual and implied findings, and the relevant law, we find the State did not carry its burden to prove a valid reason for the delay and was at least negligent in delaying appellee's trial for more than three years. While this finding weighs against the State, it does so less heavily than a deliberate attempt to delay. *See Munoz,* 991 S.W.2d at 822 (citing *Barker,* 407 U.S. at 531, 92 S.Ct. at 2192).

## ASSERTION OF THE RIGHT TO A SPEEDY TRIAL

█ *Barker* rejected the rule that a defendant waives his speedy trial claim when he has not demanded one. 407 U.S. at 527–30, 92 S.Ct. at 2190–92. Nevertheless, a defendant is still responsible for asserting or demanding his right to a speedy trial. *Munoz,* 991 S.W.2d at 825 (citing *Barker,* 407 U.S. at 528–29, 92 S.Ct. at 2191). In other words, rejection of the "demand-waiver" rule does not mean the defendant has no responsibility to assert his right to a speedy trial. The *Barker* Court emphasized that a defendant's failure to assert his right to a speedy trial "will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U.S. at 532, 92 S.Ct. at 2193.

█ The State makes two arguments in regard to this factor. First, the State argues appellee did not diligently assert his right to a speedy trial. The State correctly states that appellee did not assert his right until the day trial was set. The State contends appellee could have raised the issue many times since his arrest in 1998, and he surely could have raised it when he appeared for the July 20, 2001, setting. The State further contends that even if appellee's failure to raise his speedy trial claim before the day of trial

does not weigh against him, his decision to join the State's motion for continuance at the pretrial hearing on September 7, 2001, does. Second, the State argues we should consider appellee's motivation behind the motion to dismiss on speedy trial grounds. The State contends appellee did not file the motion because he wanted a speedy trial; rather, he filed the motion because, as appellee's counsel stated, he was "being pushed to trial" and wanted a dismissal. The State argues this establishes that appellee's primary motivation in filing the motion to dismiss was not to gain a speedy trial, but to have the charges against him dismissed.

Appellee admits that no mention was made of the right to a speedy trial until he filed his motion to dismiss the day of trial. Appellee, however, points out this was the first trial date set by the court, the State filed a motion for continuance the Friday before the trial date, and the State had not been in contact with the victim. Appellee contends that as a result of these facts, it was unclear whether a plea might be negotiated. He specifically contends he anticipated a reasonable plea offer and, therefore, did not object to the motion for continuance. When no offer was forthcoming and trial was imminent, he filed the motion to dismiss the indictment. Moreover, it was not until the pretrial hearing that appellee's counsel met appellee and discovered a material character witness, Mathis, had died the week before. It was only after there was no plea offer and the death of a material character witness, that appellee filed the motion to dismiss. Appellee argues the record establishes he played no part in the delay. Accordingly, appellee contends he has not waived his right to a speedy trial.

■ We agree that appellee has not "waived" his right to a speedy trial by failing to demand one. *See Barker*, 407 U.S. at 527–30, 92 S.Ct. at 2190–92. Appellee, however, completely failed to assert his right to a speedy trial in the more than three years from arrest to trial. There is absolutely no evidence of any expression of the desire for a speedy trial. Moreover, appellee did not object to the State's motion for continuance because he anticipated a "reasonable plea offer." As the Court of Criminal Appeals similarly noted in *Munoz*, we find it difficult to conceptualize how a defendant can hope to engage in plea negotiations without objection to any possible delay caused thereby, and then two days later assert the indictment should be dismissed because he has been denied a speedy trial. 991 S.W.2d at 826. Though we recognize the trial court denied the State's motion for continuance, when appellee essentially joined in the motion, he had no idea the trial court itself would reject any continuance. Finally, appellee admits in his brief that the objective of the motion "was not to demand a speedy trial, but to have the indictment dismissed." As the Court said in *Barker*, a failure to assert the right to a speedy trial "will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U.S. at 532, 92 S.Ct. at 2193. *See also Phillips v. State*, 650 S.W.2d 396, 401 (Tex.Crim.App. 1983) (stating that defendant's motivation in asking for dismissal rather than prompt trial is relevant and may attenuate strength of speedy trial claim).

It is clear from the record that appellee never asserted his right to a speedy trial and, while this does not constitute waiver, this failure, when coupled with appellee's other actions (not objecting to the State's motion for continuance, anticipating plea negotiations, etc.), militate against appellee relative to the third *Barker* factor.

**PREJUDICE TO DEFENDANT**

■ The last *Barker* factor is "prejudice to the defendant." *Munoz*, 991

S.W.2d at 826 (quoting *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193). Prejudice is assessed in light of the interests which the speedy trial right is designed to protect. *Id.* These interests are: (1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern to the accused; and (3) limitation of the possibility the accused's defense will be impaired. *Id.* Of these interests, or *Barker* subfactors, the most serious is the last because the inability of a defendant to prepare his case jeopardizes the fairness of the entire system. *Id.*

While a defendant need not show actual prejudice, he must make a prima facie showing of prejudice. *Munoz*, 991 S.W.2d at 826; *Webb*, 36 S.W.3d at 174. Once the defendant makes a prima facie showing of prejudice, the State then carries the obligation of proving the accused suffered no serious prejudice beyond that which ensued from the ordinary and inevitable delay. *Id.*

As to the first subfactor, there was no oppressive incarceration in this case. Appellee testified he only had to stay in jail overnight before his bond was posted. It is undisputed that but for that single night, appellee remained free on bond during the time before trial. As to the second subfactor, appellee did not allege prejudice based on pretrial anxiety or concern in his motion, presented no evidence of anxiety or concern at the hearing, and makes no argument relevant to this subfactor in his brief. Appellee is obviously relying on the third subfactor, the one considered the most serious by the courts, to establish prejudice.

Appellee essentially relied on three bases to establish that his defense was impaired by the long delay in bringing this matter to trial: (1) the loss of a material witness; (2) diminished memory; and (3) inability to locate other witnesses. Appellee testified his employer, John Mathis, the man who posted his bond, died of a heart attack the week before trial. Appellee stated he had worked for Mathis for eight or nine years and had a close working relationship with him. He testified that Mathis knew his character for truthfulness, knew he was non-violent, knew about his work-ethic, knew his family, and was familiar with his credibility. Appellee went so far as to say Mathis was like a father to him. Appellee's counsel argued Mathis was a material witness because appellee intended to allege self-defense, which put his character for violence at issue. He further argued Mathis would be an important witness at the punishment stage in the event appellee was convicted. Appellee alleged there was no other witness who could present the same testimony as well as Mathis, especially given that Mathis was a former prison warden with special insight into possible probation eligibility.

Appellee also testified, somewhat vaguely, that his memory had diminished since the night of the alleged incident in 1996. He stated, "I can't give the direct details of everything that happened like I did that night. That night-that same night that it happened, everything was still fresh in my memory." He further stated he has tried not to think about the incident and some parts of his memory of that night are gone.

Finally, appellee testified there are witnesses from the time of the incident that he has been unable to contact-friends from that time period who have died or moved away. Appellee, however, did not provide the names of these "friends" or what testimony they might have provided. His attorney contended that because of the delay there was no way to locate any witnesses from that time period and, therefore, he

would be forced to rely on the investigation conducted by the police department.

Based on this evidence, we find appellee made a prima facie showing of prejudice, and thus, the burden shifted to the State to show the prejudice was not serious, i.e., that it did not exceed that which occurs from the ordinary and inevitable delay.

 As to the loss of the material witness, Mathis, the State asserts appellee's allegations that Mathis would have given favorable testimony on a material issue are self-serving and conclusory and, therefore, insufficient under this Court's opinion in *Webb*. We recognize, as we did in *Webb*, that some prejudice is obvious when a witness dies or disappears during a delay. However, in determining if the witness was believed to be material to the case, a court can consider whether there is any evidence the defendant attempted to obtain the witness' statement during the delay. *Webb*, 36 S.W.3d at 175. In *Webb*, the witness the appellant wished to call died fifteen days before trial. *Id.* at 174. The appellant testified the witness, a neighbor, would have corroborated his version of some of the events and much of his testimony. *Id.* at 175. The record, however, failed to indicate the appellant took any action to suggest the witness had material information about the case. *Id.* In the nineteen months from the indictment to the trial, the appellant never attempted to interview the witness, take a sworn statement from him, or arrange for a trial subpoena to secure his attendance at trial. *Id.* Based on these facts, we held the appellant did not establish undue prejudice. In reaching this conclusion we held persons asserting denial of the right to a speedy trial must come forward with more than their own self-serving and conclusory statement that a witness who died shortly before trial would have given testimony on a material issue. *Id.* We further held an

accused's bold assertion, standing alone, is insufficient to demonstrate prejudice. *Id.*

In this case, as in *Webb*, appellee presented nothing more than his bare assertion that Mathis knew his character, could testify he was non-violent, and if appellee were convicted, could testify appellant was a good candidate for probation. Appellee's trial was delayed for more than three years, yet appellee never took any steps to secure Mathis' testimony.

Moreover, on cross-examination, appellee admitted he knew and had worked with Mathis' two daughters for as long as he had worked with Mathis. He stated that while he was closer to Mathis, both daughters were still alive and they could testify about his character. When the evidence suggests the evidence lost because of the death of a witness is available from other sources, we cannot conclude appellee was seriously prejudiced. *See id.* In such a situation, if the accused's defense is impaired at all, the impairment is minimal. *Id.*

 We now turn to appellee's assertion of diminished memory. Appellee made vague assertions that his memory of what happened the night of the alleged attempted assault was not as fresh as it had been the night of the event. Additionally, appellee claimed the statement he made to police on the night of the alleged offense was made in response to direct questions, rather than a narrative statement. On cross-examination, however, appellee admitted everything in the statement was correct, precise, and complete. He stated the officers did not prevent him for saying anything and he felt like he had told the officers everything he needed to tell them. Moreover, he admitted that when asked by the police that night if he wanted to add anything to his statement, he declined-he had said everything he wanted to say.

■ Because appellee prevailed in the trial court, we defer to the trial court's implied finding that the delay caused appellee a loss of memory in relation to the details of the alleged offense. This, however, is not a sufficient showing to establish prejudice. *See Munoz,* 991 S.W.2d at 829. A defendant is required to show that any lapses of memory are in some way significant to the outcome of the case. *Id.* (citing *Barker,* 407 U.S. at 534, 92 S.Ct. at 2194). Loss of memory claims like those asserted by appellee in this case do not meet this standard. Appellee did nothing more than allege a possibility of prejudice from his diminished memory. He did not provide any evidence on how this loss was significant to the case other than his claim that he could recall the events better on the night of the alleged offense than he can now. Any showing of prejudice was, at best, minimal.

■ Finally, appellee claimed it was now impossible for him to locate other witnesses because so much time had passed since the alleged crime and he would be forced to rely on the investigation conducted by the police. When pressed by the State, however, appellee was unable to specifically name one witness or state what material testimony any witness might have provided at his trial. Additionally, appellee admitted that only he, the owner of the residence, and the alleged assault victim were witnesses to the events in 1996. Appellee did not suggest these witnesses were unavailable. Moreover, appellee admitted there were no witnesses to the alleged offense that he wanted to subpoena. Finally, appellee's counsel admitted he had never asked the State if there were other witnesses to the offense nor did he ask to review the offense reports filed in the case. We hold appellee's vague assertions are insufficient to establish even minimal prejudice based on the inability to locate witnesses.

Keeping in mind that impairment of the accused's defense is the most important subfactor, we do not find appellee suffered prejudice as a result of the delay in his trial. There was no pretrial incarceration, no evidence that appellee suffered anxiety or concern as a result of the delay, and if his defense was impaired at all, the impairment was minimal.

## BALANCING THE *BARKER* FACTORS

■ We must now balance the four *Barker* factors to determine if appellee was, as the trial court found, denied his right to a speedy trial. The length of the delay, more than three years, is presumptively prejudicial and unreasonable and therefore supports appellee's position. Additionally, the reason for the delay, the State's inability to locate appellee, weighs, though not heavily, against the State. While the State did not deliberately delay bringing this matter to trial, it was at least negligent in its efforts to locate appellee for almost three years. Though the first two factors weigh in appellee's favor, the final two factors do not. Appellee never expressed his desire for a speedy trial and never expressly asserted his right to a speedy trial. Appellee acquiesced in the State's request for a continuance and anticipated plea negotiations. It was not until the day of trial that appellee raised the specter of a speedy trial claim and that was only to obtain a dismissal, not a speedy trial. Finally, while appellee made a prima facie showing of prejudice as a result of the delay, the State established the prejudice was not serious. Appellee was not incarcerated pretrial, he did not suffer from anxiety or concern because of the delay, and any impairment to his defense was minimal. Thus, while the length of the delay and the State's negligence weigh in appellee's favor, the failure to

assert his right to a speedy trial and a lack of prejudice weigh heavily against him.

After balancing the *Barker* factors, we hold the trial court erred in granting appellee's motion to dismiss the indictment on speedy trial grounds. Accordingly, we reverse and remand this case to the trial court for further proceedings.[1]

SCOTT BRISTER, C.J., dissenting.

SCOTT BRISTER, Chief Justice, dissenting.

As the majority and the trial judge agree, this case is a close one. That being true, I cannot say the judgment below was an abuse of discretion. Our record is quite bare—we do not have the police report or any witness statements, and of course have not had the benefit of hearing appellant George Roy Smith in person. Indeed, we know nothing about the circumstances, seriousness, or nature of the offenses alleged in this case. Rather than reverse a trial judge who presumably did know about such things, I respectfully dissent.

This case did not fall through a crack-it was dropped. While there is no evidence the prosecutor's office intentionally delayed Smith's trial, it certainly did nothing to make it speedy. The offense allegedly occurred on January 6, 1996. Smith was not indicted until July 9, 1998, over two and a half years later. One week later, efforts to locate him were abandoned for the next two and a half years. While the State faults Smith for not living at the residence address listed on the bond, there is no evidence he was attempting to evade apprehension. Nor is there any evidence he could not be reached through his employer, who posted his bond and for whom he worked throughout these years.

The case reappeared on the State's radar screen only after Smith's employer tried to get his bond money back. The trial judge insisted on a speedy trial, noting that the case was the oldest one on his docket. Nevertheless, four days before trial the State moved for a continuance because (1) the alleged victim of the burglary told the prosecutor no burglary occurred, and (2) the alleged victim of the assault had been subpoenaed but had not contacted the prosecutor.

I disagree with the majority's balancing analysis on one point—that although Smith made a prima facie showing of prejudice, the State showed the prejudice was not serious. Smith testified without contradiction that John Mathis (his recently-deceased employer) was a former prison warden who would have testified favorably for him as to his character, truthfulness, nonviolence, and (if necessary) suitability for probation. I would assume most defendants in Brazos County do not have a former prison warden willing to stand as their character witness; undoubtedly, most do not have one post bond for them.

Nor would I fault Smith for failing to preserve Mathis's testimony. In *Webb v. State*, there was no support for the defendant's "bold assertion" that a dead witness would have been favorable to him; defense counsel had not even interviewed the witness in the twenty months between arrest and trial. 36 S.W.3d 164, 175 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd). In this case, Smith's counsel was appointed less than two months before trial, and we need not guess whether Mathis would have

1. By this reversal, this Court in no way condones the State's negligence in failing to bring appellee to trial for more than three years. It is simply that under the specific facts of this case, the *Barker* factors weigh more heavily against, rather than in favor of, appellee's speedy trial claim.

been supportive, given his willingness to put his pocketbook at risk.

I agree with the majority that Smith's testimony about his efforts to contact the court, his memory loss, and the existence of other witnesses was vague, conclusory, and almost incredible—but not quite. Because Smith prevailed below, we must presume the trial court resolved any factual disputes in his favor, and defer to those implied findings if the record supports them. *State v. Munoz,* 991 S.W.2d 818, 821 (Tex.Crim.App.1999). With an opportunity to hear and observe Smith personally, and access to more information about the alleged offenses than appears in our record, the trial judge knew more about possible prejudice to Smith than we possibly can. Thus, I would affirm the judgment of the trial court.